IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR 122-104 |
| | ) | |
| CARL CRAWFORD | ) | |

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Defendant, charged with possession with intent to distribute para-fluorofentanyl, seeks to suppress evidence and statements obtained during a search of his residence on August 16, 2022. After careful consideration of all briefing and the evidence presented at the hearing on March 29, 2023, the Court **REPORTS** and **RECOMMENDS** Defendant's motion to suppress be **DENIED**. (Doc. no. 27.)

**I.  BACKGROUND**

Special Agent Robert Stewart is a member of the Safe Streets Gang Task Force. (Transcript "Tr." at 10.) Since 2017, this task force has been investigating a bank fraud scheme by Loyalty Over Everything ("LOE"), a street gang in Augusta, Georgia, that is affiliated with the Bloods gang ("the Bloods") and known for violent crime, drug trafficking, and financial fraud. Tr. 10-12, 24. On January 10, 2022, Grovetown Police Department officers conducted a traffic stop of a white Dodge Charger with three passengers, all of whom were known LOE members with active warrants, and suspects in the recent murder of a child. Tr. 13, 43. Officers seized multiple firearms, drugs, and forty-five financial transaction cards. Tr. 13.

Some of the cards bore the names of other LOE members, including a Chase Bank card bearing the name of Defendant. Tr. 13-14.

The banking scheme involved depositing fraudulent checks into bank accounts created by co-conspirators and withdrawing the deposited funds quickly, typically by ATM or mobile deposit, during the window of time between when banks credited the deposits but before they froze the funds due to suspected fraudulent activity. Tr. 12-13, 42, 50. Based on a review of Facebook and other social media posts, investigators determined LOE members were the leaders of this fraud ring and used social media to recruit people who consented to LOE using their accounts for deposits and withdrawals. Tr. 41, 46. Thus, based on their knowledge of the fraud scheme, officers suspected the individuals named on the financial transaction cards found in the Dodge Charger, including Defendant, were co-conspirators. Tr. 24-25, 38. Cardholders were recruited by LOE members to participate in the scheme, provided the members with access to their accounts, and never had credible explanations when questioned by police for why their debit cards were in the possession of fraudsters. Tr. 12, 37-40. Indeed, officers had not encountered any instance when they believed the cardholder was a victim rather than a co-conspirator. Tr. 12, 49-51.

Following the traffic stop and after receiving a list of cardholder names, Richmond County deputies searched Defendant's name in a database and learned two officers from the gang unit verified Defendant as a member of LOE in 2020. Tr. 15-16. The verification was based on information that included, at least in part, a tattoo on Defendant commemorating LOE's murder of Gerald Clifford in 2014. Tr. 15-16. Defendant's tattoo refers to Mr. Clifford as "Gangsta Bruh." Tr. 15-16, 25-26. The Georgia Department of Corrections database also validated Defendant as a Bloods member while he was in prison between 2008 and 2015. Tr.

16, 24, 60. Defendant claims by affidavit that Mr. Clifford was his cousin, but officers did not know that at the time. Tr. 21, 26; (see doc. no. 42-1).

On August 16, 2022, several state and federal agencies worked together to conduct an operation to search the homes of known or suspected LOE gang members who were on probation and subject to a Fourth Amendment waiver. Tr. 16. Defendant was included because officers determined he satisfied all three criteria. Tr. 16-17, 20, 24. At the time officers decided to search Defendant's home, they knew the following facts concerning LOE's financial fraud scheme and Defendant:

1. Defendant was a validated member of LOE and the Bloods, and LOE is known to be affiliated with the Bloods. Tr. 16, 23-24.
2. LOE was conducting a financial fraud scheme in the Augusta area utilizing bank accounts and financial transaction cards of co-conspirators. Tr. 11-15.
3. Officers found forty-five transaction cards in a Dodge Charger during a traffic stop in the Augusta area. Tr. 13.
4. All three occupants of the Dodge Charger were known LOE members, including Henri Beach, who was "one of the biggest players in this fraud scheme." Tr. 46-47.
5. Cardholders were likely, if not certainly, co-conspirators recruited by LOE to participate in the scheme. Tr. 25-26, 41-42, 49-52.
6. Defendant was a cardholder on one of the forty-five cards found in the Dodge Charger. Tr. 14.
7. Officers confirmed that one of the other cards found in the Dodge Charger was used in the fraud scheme. Tr. 47-48.
8. Defendant failed to call in to his supervising probation officer and then failed to report for a drug screen on Friday, July 8, 2022. Tr. 67, 71-72.

Richmond County Sheriff's Deputy Parker Leathers was a part of the team that searched Defendant's home on August 16, 2022. Tr. 91. During the search, Deputy Leathers stood across from Defendant while he was sitting in a chair at the kitchen table. Tr. 91. Defendant was not handcuffed, but he was not free to leave or walk around the residence. Tr.

3

92. Deputy Leathers wore a body camera during the search, and his footage was admitted as Exhibits 1G, 1H, and 5.  (Doc. no. 34, p. 1.)  Officers Broughton and Bell, both of whom did not testify at the hearing, also wore body cameras during the search of Defendant's home and their footage was admitted as Exhibits 1A-1F, 4.  (Id.)

Department of Community Supervision ("DCS") Chief Officer John Beckman testified that during the search, he found a lockbox in Defendant's bedroom and asked Defendant for the combination.  Tr. 99.  Defendant denied knowing the combination, explaining his girlfriend was pregnant and the lockbox would be opened during a gender reveal.  Tr. 99.  Because the lockbox appeared to be new, Officer Beckman tried the code "000" and it opened.  Tr. 99.  The incident report from the search, however, inaccurately stated Defendant told officers to "try 000."  Tr. 105.  Deputy Leathers testified, and his body camera footage confirms, Defendant did not say anything else to the officers during the eight minutes between initiation of the home search and his arrest, and Deputy Leathers did not ask him any questions.  Tr. 95; (doc. no. 34, Ex. 5 at 2:16-8:22).  The lockbox contained ten grams or more of fentanyl.  (Doc. no. 24, Ex. 6; Ex. 7 at 10:59-11:15.)  Deputy Leathers arrested Defendant on Officer Beckman's command.  Tr. 93-94; (doc. no. 34, Ex. 5 at 5:02-5:30).  Officers never read Defendant his Miranda rights during the home search or after his initial arrest.  Tr. 95.

It is now known Defendant never signed any of the sentencing documents, including the special probation conditions form containing the Fourth Amendment waiver, and the sentencing judge never explained the waiver provision at sentencing.  (Doc. no. 34, Exs. 1, 2, 4a, 5a.)  The government concedes the waiver is invalid under Georgia law pursuant to Fox v. State, 527 S.E.2d 847, 849 (Ga. 2000), but argues for application of the good faith exception

4

to the exclusionary rule. (Doc. no. 41, p. 8.) In this context, DCS Officer Mark Bringelson offered the following testimony at the suppression hearing.

When preparing the list of probationers to include in the August 16, 2022 multi-agency search operation, Officer Bringelson searched a DCS database and determined Defendant was actively serving a term of probation and subject to a Fourth Amendment search waiver. Tr. 16-17, 60, 62. Officer Bringelson never relies solely on the waiver denotation in the database and always pulls a copy of the sentencing documents to confirm existence of the waiver. Tr. 62-63. When Officer Bringelson accessed Defendant's sentencing documents, he confirmed the sentencing judge signed both the Final Disposition and Inventory of Special Conditions of Probation, the latter of which specifies Defendant is subject to a Fourth Amendment waiver. (Doc. no. 34, Ex. 1, p. 7.) However, the space where Defendant was supposed to sign both documents was blank. (Id. at 5, 10.) Office Bringelson pulled these documents from the database before the search of Defendant's home and knew Defendant's signature was missing. Tr. 62-63.

While the absence of a defendant's signature on sentencing documents is unusual in normal periods of operation, it was not unusual for sentencings like Defendant's that occurred during the pandemic because defendants were not appearing in person for sentencings and appointments with probation officers. Tr. 63-64, 87-88. Even before the pandemic, probation officers would occasionally fail to upload the signed version of the waiver even though it existed. Tr. 64. Accordingly, when Officer Bringelson reviewed Defendant's waiver in the DCS database and saw it was unsigned, he assumed another copy existed with Defendant's signature. Tr. 69.

5

Furthermore, Defendant was sentenced in Richmond County, and Officer Bringelson testified all defendants sentenced for a felony offense in Richmond County are subject to a Fourth Amendment waiver with a reasonable suspicion standard, pursuant to a longstanding policy adopted by all judges of the Superior Court. Tr. 70, 71. Based on his experience and knowledge of the topics addressed at sentencing, Officer Bringelson assumed the sentencing judge reviewed the waiver and other probationary terms with Defendant at sentencing. Tr. 80-81. At the time, Officer Bringelson was unaware that, in Fox, the Supreme Court of Georgia held a Fourth Amendment waiver is invalid if imposed by the sentencing court without the defendant expressly agreeing to it. Tr. 81-82, 84. Officer Bringelson further assumed the sentencing court and probation officer satisfied any such legal contingencies at the time of sentencing. Tr. 82.

Officer Bringelson and his team decided there was reasonable suspicion to search Defendant's home because: (1) Defendant failed to report for a drug screen with his supervising probation officer on July 8, 2022; (2) he was a validated member of LOE and the Bloods; and (3) his Chase bank card was found in the Dodge Charger occupied by validated LOE members that were known to be conducting a bank fraud scheme utilizing the financial transaction cards. Tr. 16-27, 67, 71-73.

## II.  DISCUSSION

Defendant argues the search of his home is unconstitutional because he never signed the Fourth Amendment waiver, the officers' knowledge of the unsigned waiver precludes application of the Leon good faith exception, and regardless, there was no reasonable suspicion to search his residence. (See generally doc. no. 27.) Defendant further argues any

6

incriminating statements made during the search should be suppressed because he was in custody and not Mirandized. (Id. at 5-6; doc. no. 42, pp. 18-20.)

Conceding invalidity of the Fourth Amendment waiver under Fox, the government argues the search was constitutional because Defendant had a reduced expectation of privacy while on probation, reasonable suspicion supported the search, and the Leon good faith exception applies. (Doc. no. 28, pp. 5-11; doc. no. 41, pp. 9-10.) The government further argues Defendant was not in custody at the time of any incriminating statements. (Doc. no. 28, pp. 13-14.) The Court agrees with the government.

### A. Defendant's Probation Conditions Reduced His Expectation of Privacy and Permitted a Warrantless Home Search Based on Reasonable Suspicion

The conceded invalidity of Defendant's unsigned Fourth Amendment waiver does not render his Georgia sentence void or call into question the general conditions of probation imposed by the sentencing court. See, e.g., Hallford v. State, 657 S.E.2d 10, 12 (Ga. Ct. App. 2008) (explaining illegality of one probation condition does not render sentence void or invalidate other probation conditions, and instead "invalid conditions of probation may simply be stricken."). Nor does it automatically render the search of Defendant's home unconstitutional. "The key inquiry is not whether the search conditions were legally valid or properly followed, but instead whether defendant had a diminished expectation of privacy requiring only reasonable suspicion for a warrantless search of the home." United States v. Linder, No. CR 319-003, 2019 WL 3560520, at *5 (S.D. Ga. June 21, 2019).

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The Fourth Amendment generally requires a search warrant with probable cause, and searches conducted without a search warrant are considered "per se unreasonable under the Fourth Amendment [and are] subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967).

Although the Fourth Amendment's protection against unreasonable searches and seizures applies to probationers, they "may be subject to restrictions that diminish [their] reasonable expectations of privacy." United States v. Boynton, 337 F. App'x 801, 803 (11th Cir. 2009) (*per curiam*); Owens v. Kelley, 681 F.2d 1362, 1366-67 (11th Cir. 1982) (finding probation conditions requiring probationer submit to search constitutional because such condition reasonably serves the purposes of probation under Georgia law). Courts "'examine the totality of the circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment." Samson v. California, 547 U.S. 843, 848 (2006) (quoting United States v. Knights, 534 U.S. 112, 118-19 (2001)). This is because "[t]he touchstone of the Fourth Amendment is reasonableness," determined by "assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." Knights, 534 U.S. at 118-19 (internal quotation marks and citations omitted).

Here, the sentencing judge imposed the following general conditions of probation:

**GENERAL CONDITIONS OF PROBATION**

The Defendant is subject to arrest for any violation of probation. If probation is revoked, the Court may order incarceration. The Defendant shall comply with the following General Conditions of Probation: 1) Do not violate the criminal laws of any governmental unit and be of general good behavior. 2) Avoid injurious and vicious habits. 3) Avoid persons or places of disreputable or harmful character. 4) Report to the Community Supervision Officer as directed and permit the Community Supervision Officer to visit you at home or

8

elsewhere.  5) Work faithfully at suitable employment insofar as may be possible.  6) Do not change your place of abode, move outside the jurisdiction of the Court, or leave Georgia without permission of the Community Supervision Officer.  If permitted to move or travel to another state, you agree to waive extradition from any jurisdiction where you may be found and not contest any effort by any jurisdiction to return you to this State.  7) Support your legal dependents to the best of your ability.  8) When directed, in the discretion of the Community Supervision Officer:  (a) submit to evaluations and testing relating to rehabilitation and participate in and successfully complete rehabilitative programming; (b) wear a device capable of tracking location by means including electronic surveillance or global positioning satellite systems; (c) complete a residential or nonresidential program for substance abuse or mental health treatment; and/or (d) agree to the imposition of graduated sanctions as defined by law.  9) Make restitution as ordered by the Court.

(Doc. no. 34-1, p. 4.) Particularly important for the privacy analysis are the requirements that Defendant report to his supervising officer as directed, permit the officer to visit him at his home, and submit to any drug testing and location monitoring if directed by the officer. (Id.)

Ample precedent makes clear that, even in the absence of a valid Fourth Amendment waiver, these expansive restrictions and requirements undoubtedly diminished Defendant's expectation of privacy to a degree that permitted the warrantless search of his home based on reasonable suspicion. See, e.g., United States v. Carter, 566 F.3d 970, 974-75 (11th Cir. 2009) (*per curiam*) (finding reduced privacy expectation despite absence of search condition when probation conditions required submission to home and work visits by supervising officer); United States v. Walley, 271 F. App'x 966, 968 (11th Cir. 2008) (*per curiam*) (finding reduced privacy expectation despite absence of express search condition when probation conditions barred contact with illegal drugs or additional criminal charges); United States v. Yuknavich, 419 F.3d 1302, 1309-11 (11th Cir. 2005) (finding reduced privacy expectation despite absence of search condition when probation conditions regulated computer use and internet access); Castillo v. United States, 816 F.3d 1300, 1305 (11th Cir. 2016) (finding reduced privacy expectation of pretrial intervention defendant—considered under same standard as

probationers and parolees—despite absence of search condition when probation conditions permitted suspicionless drug tests, home visits, and required answers to supervising officer's questions); see also United States v. Keith, 375 F.3d 346, 349-50 (5th Cir. 2004) (finding reduced privacy expectation despite absence of search condition when probation conditions prohibited defendant from possessing dangerous weapons).

### B. Reasonable Suspicion Supported the Search of Defendant's Home

Reasonable suspicion must be more than "an inchoate and unparticularized suspicion or hunch." United States v. Acosta, 363 F.3d 1141, 1145 (11th Cir. 2004). But reasonable suspicion is "less demanding" than probable cause and requires a showing that is "considerably less than preponderance of the evidence." Jackson v. Sauls, 206 F.3d 1156, 1156 (11th Cir. 2000). Simply put, reasonable suspicion only requires a "minimal level of objective justification." Id.; United States v. Collins, 683 F. App'x 776, 779 (11th Cir. 2017) (explaining numerous facts are not necessary to establish reasonable suspicion, and that reasonable suspicion exists if facts and rational inferences from those facts, taken together, can provide a particularized objective for officers to suspect that a probationer was engaged in misconduct); United States v. White, 593 F.3d 119, 1203 (11th Cir. 2010) (finding that the smell of marijuana alone was sufficient to provide reasonable suspicion that justifies further investigation of possible criminal conduct). "Reasonable suspicion consists of a sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable." Yuknavich, 419 F.3d at 1311 (internal quotation marks omitted). To determine whether a probation officer has reasonable suspicion to search a probationer's property, we "must take stock of everything [the officer] knew before searching." Id.

Here, as detailed in the factual background, Defendant was a validated LOE and Bloods member, LOE was perpetrating a widespread bank fraud scheme utilizing bank accounts and financial cards obtained by co-conspirators, and Defendant's bank card was one of forty-five found in the car of three known LOE members, one of whom was "one of the biggest players" in the fraud scheme. In addition, Defendant recently violated terms of his probation conditions when he failed to conduct a monthly check-in with his probation officer, and after being directed by his supervising officer, did not appear for a drug screening.

Taking all these facts into consideration, as the Supreme Court stated in Knights, officers could rationally suspect "a sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable." Knights, 534 U.S. at 118-19; see, e.g., United States v. Pope, No. 21-12173, 2022 WL 7273945, at *3 (11th Cir. 2022) (*per curiam*) (confirming reasonable suspicion to search when officers knew probationer was noncompliant with reporting, officers received conflicting accounts of whether defendant was home, and officers observed two other men in garage); United States v. Harris, 635 F. App'x 760, 765 (11th Cir. 2015) (*per curiam*) (finding sufficient reasonable suspicion to search based on defendant's criminal background, possession of drug paraphernalia, and recent failure to report to probation); see also Carter, 566 F.3d at 970, 973-75 (finding reasonable suspicion to search because probationer "lived above his means," was on probation for drug distribution, and gave person business card with gang logo on it); United States v. Wasser, 586 Fed. App'x 501, 505 (11th Cir. 2014) (*per curiam*) (finding officers had reasonable suspicion because probationer was known gang member with prior weapons charge and anonymous tip alleged he possessed weapons in plain view); United States v. Palmore, No. 7:21-CR-52-WLS-TQL, 2022 WL 17478240, at *5-*6 (M.D. Ga. Dec. 6, 2022) (finding

11

reasonable suspicion due to defendant's validated status as gang member and recent shooting involving same gang).

### C. Even if the Search Violated the Fourth Amendment, the Good Faith Exception to the Exclusionary Rule Applies

The judicially created remedy known as the exclusionary rule acts as a deterrent to Fourth Amendment violations by prohibiting admission of the resulting evidence. United States v. Martin, 297 F.3d 1308, 1312 (11th Cir. 2002). However, "[t]he fact that a Fourth Amendment violation occurred . . . does not necessarily mean the exclusionary rule applies." Herring v. United States, 555 U.S. 135, 141 (2009) (citing Illinois v. Gates, 462 U.S. 213, 223 (1983)). "Indeed, exclusion 'has always been our last resort, not our first impulse . . . .'" Id. at 140 (quoting Hudson v. Michigan, 547 U.S. 586, 591 (2006)). To warrant exclusion, "the benefits of deterrence must outweigh the costs," and the principal cost is "letting guilty and possibly dangerous defendants go free—something that offends basic concepts of the criminal justice system." Id. at 141 (citations and internal quotations marks omitted).

The inquiry is objective and asks "'whether a reasonably trained officer would have known that the search was illegal' in light of 'all the circumstances.'" Herring, 555 U.S. at 145 (quoting United States v. Leon, 468 U.S. 897, 922 n.23 (1984)). The focus of the inquiry is the culpability and mindset of a reasonable officer because "the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." Leon, 468 U.S. at 916. Moreover, the government bears the burden of demonstrating the good faith exception applies. United States v. Morales, 987 F.3d 966, 974 (11th Cir. 2021); United States v. Robinson, 336 F.3d 1293, 1296-97 (11th Cir. 2003).

The basic insight of the Leon line of cases is the deterrence benefits of exclusion "var[y] with the culpability of the law enforcement conduct" at issue. Herring, 555 U.S. at 143. When

the police exhibit "deliberate," "reckless," or "grossly negligent" disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. Id. at 144. The exclusionary rule thus applies to police conduct that is deliberate, reckless, or grossly negligent but not to isolated incidents of negligence. United States v. Brooks, 648 F. App'x 791, 794 (11th Cir. 2016) (*per curiam*) (quoting Herring, 555 U.S. at 144). When police act with an objectively reasonable good-faith belief that their conduct was lawful, the "'deterrence rationale loses much of its force,'" and exclusion cannot "pay its way." Leon, 486 U.S. at 919 (quoting United States v. Peltier, 422 U.S. 531, 539 (1975)).

This case clearly qualifies for the good faith exception. The search was based on the reasonable belief that Defendant's Fourth Amendment probation waiver was valid because the sentencing judge imposed this special condition and signed the sentencing documents. Officer Bringelson assumed the sentencing judge and court personnel performed all tasks necessary to ensure the waiver condition imposed by the judge was valid. This reliance was inherently reasonable, and such ordinary negligence in failing to procure Defendant's consent to the search waiver would not likely be deterred by application of the exclusionary rule. Arizona v. Evans, 514 U.S. 1, 25 (1995) (applying good faith exception where officers reasonably relied on warrant that erroneously appeared outstanding due to court's clerical error); Herring, 555 U.S. at 146 (applying good faith exception where officers reasonably relied on warrant that erroneously appeared outstanding in police database); see also United States v. Taylor, 935 F. 3d 1279, 1290 (11th Cir. 2019) (applying good faith exception where officers reasonably relied on void warrant in light of exclusionary rule's purpose of deterring culpable police misconduct).

13

As explained above, a warrantless search based on reasonable suspicion is constitutional even in the absence of a valid search waiver where, as here, Defendant is subject to a host of other conditions that diminish the expectation of privacy. Furthermore, officers possessed ample reasonable suspicion to search. Even if there was no reduced privacy expectation or reasonable suspicion, which there was, the arguments in favor of each are strong enough to have convinced this Court and preclude a finding the officers were deliberate, reckless, or grossly negligent.

In sum, officers acted with "an objectively reasonable good-faith belief that their conduct [was] lawful," and thus, the good faith exception to the exclusionary rule applies here. The officers' behavior is not culpable, and there is little, if any, deterrent benefit in such circumstances. Davis v. United States, 564 U.S. 229, 236 (2011); Taylor, 935 F.3d at 1293.

### D. There is No Basis for Suppression of Defendant's Statements Because He Was Not in Custody During the Search of His Home

"No person . . . shall be compelled in any criminal case to be a witness against himself. . . ." U.S. Const. amend. V. "To give force to the Constitution's protection against compelled self-incrimination, the Court established in Miranda v. Arizona, 384 U.S. 436 (1966), 'certain procedural safeguards that require police to advise criminal suspects of their rights under the Fifth and Fourteenth Amendments before commencing custodial interrogation.'" Florida v. Powell, 559 U.S. 50, 59 (2010) (citing Duckworth v. Eagan, 492 U.S. 195, 201 (1989)). Under Miranda, prior to conducting a custodial interrogation, law enforcement officers must warn the interview subject that he has a "right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. at 444.

The Supreme Court has defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. When analyzing whether Miranda warnings are required, the Court must decide whether "under the totality of the circumstances, a reasonable man in the suspect's position would feel a restraint on his freedom of movement fairly characterized as that degree associated with a formal arrest to such extent that he would not feel free to leave." United States v. Paige, 541 F. App'x 620, 622 (11th Cir. 2007) (*per curiam*) (citing United States v. Muegge, 225 F.3d 1267, 1270 (11th Cir. 2000) (*per curiam*) (citation omitted).)

"The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996). The objective standard contemplates the perspective of a reasonable innocent person. Paige, 541 F. App'x at 622. Factors to consider include whether "the officers brandished weapons, touched the suspect, or used language or a tone that indicated compliance with the officer could be compelled." United States v. Street, 472 F.3d 1298, 1309 (11th Cir. 2006).

A seizure does not equate to custody for Miranda purposes. Id. at 1309-10. A person is "seized" when "a reasonable person would not feel free to terminate the encounter" with the police. Id. at 1310. A person is in custody "only when there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Id. (citation omitted); see also United States v. Luna-Encinas, 603 F.3d 876, 881 (11th Cir. 2010) ("We previously have explained, however, that although a reasonable person in the defendant's position may feel constrained not to leave the scene of a police encounter at a particular moment—and thus

15

may be deemed to have been 'seized' by law enforcement—he will not necessarily be considered in 'custody' for Fifth Amendment purposes.").

In Jackson v. Denno, 378 U.S. 368, 376 (1964), the Supreme Court explained that a defendant is deprived of Due Process if he is convicted, based in any part, on an involuntary confession. Coercion may be mental or physical, Blackburn v. Alabama, 361 U.S. 199, 206 (1960), and "'[s]ufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession.'" United States v. Thompson, 422 F.3d 1285, 1295-96 (11th Cir. 2005) (quoting United States v. Mendoza-Cecelia, 963 F.2d 1467, 1475 (11th Cir. 1992), *abrogated on other grounds*, Coleman v. Singletary, 30 F.3d 1420 (11th Cir. 1994)).

Having carefully considered the totality of the circumstances prior to Defendant's arrest, the Court finds Defendant was not in custody. While Defendant's home was searched, a reasonable person in his position would not have felt "a restraint on his freedom of movement fairly characterized as that degree associated with a formal arrest to such extent that he would not feel free to leave." Paige, 541 F. App'x at 622. The tone and demeanor were calm, and there was no brandishing of weapons, touching of Defendant, intimidation, aggression, threats, coarse language, or raised voices. While the officers did not tell Defendant he was free to leave, they also did nothing to suggest Defendant was under arrest. Moreover, Defendant never expressed any desire to leave the house or the seat where he was located at the kitchen table, and as seen on Deputy Leather's body camera footage, officers allowed the other residents of the house to move around freely, and Defendant's girlfriend voluntarily sat next to him at the table. Tr. 95, 98; (doc. no. 34, Ex. 5 at 2:14-7:31).

Although questioning in a defendant's home is not dispositive, United States v. Brown, 441 F.3d 1330, 1348 (11th Cir. 2006), "courts are *much* less *likely* to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home." United States v. Gomes, 279 F. App'x 861, 868 (11th Cir. 2008) (*per curiam*) (citation omitted); United States v. Peck, No. 1:13-CR-171, 17 F.Supp.3d 1345, 1360 (N.D. Ga. Apr. 18, 2014) (holding that questioning in a suspect's home weighs against determination of custodial interrogation requiring Miranda warnings); see also United States v. Newton, 369 F.3d 659, 675 (2d Cir. 2004) ("[A]bsent an arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial.").

While the officers never uttered the phrase "free to leave," this omission is not dispositive of the custody analysis, and courts often find no custody where, as here, a host of other facts show the restraint on freedom never approached the degree associated with a formal arrest. See, e.g., United States v. Teers, 591 F. App'x 824, 836 (11th Cir. 2014) (*per curiam)* (finding no custody despite omission because defendant not physically forced to interview, nor was he handcuffed or restrained); see also United States v. Phillips, 812 F.2d 1355, 1362 (11th Cir. 1987) (finding defendant not in custody during interview at police station despite omission because he was not restrained during interview, did not attempt to terminate interview, and did not ask for lawyer); United States v. Brown, No. 1:20-CR-288-MHC-AJB, 2021 WL 3916845, at *6 (N.D. Ga. Aug. 11, 2021) (finding no custody despite omission because conversation was cordial, non-confrontational, and conversational, and at no time did officers inspect, touch, frisk, search, or restrain).

Defendant complains officers restricted him to one room during the search in the presence of an officer who was armed. However, minor restraints on freedom of movement

17

during a search do not convert a non-custodial setting to a custodial setting.  See <u>United States v. Matcovich</u>, 522 F. App'x 850, 852 (11th Cir. 2013) (*per curiam)* (no custody where officers temporarily handcuffed residents and placed them in central location); <u>United States v. Varnell</u>, No. 1:13-CR-394, 2014 WL 5517923, at *3, *7-8 (N.D. Ga. Oct. 28, 2014) (finding no custody where agent escorted all members of residence, including defendant, to living room while executing search); <u>United States v. Graham</u>, No. 3:13-CR-11-TCB, 2014 WL 2922388, at *3, *6-7 (N.D. Ga. June 27, 2014) (finding no custody where fifteen agents temporarily placed defendant and fellow residents in handcuffs and transported them to central location in house).

For these reasons, and having considered the totality of the circumstances, the Court finds Defendant was not in custody during this phase of the search and thus <u>Miranda</u> warnings were not required.  <u>United States v. Crawford</u>, 294 F. App'x 466, 474 (11th Cir. 2008).

### III.  CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** Defendant's motion to suppress be **DENIED**.  (Doc. no. 27.)

SO REPORTED and RECOMMENDED this 7th day of July, 2023, at Augusta, Georgia.

_____
BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA